UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA, | 25 Cr. 283 (PAE) |
| -v- | OPINION & ORDER |
| ALI RASHAN, | |
| Defendant. | |

PAUL A. ENGELMAYER, District Judge:

Trial in this healthcare fraud case is scheduled to begin on May 11, 2026. This decision resolves a motion by defendant Ali Rashan to preclude portions of the testimony of two experts whom the Government proposes to call.[1]

Rashan is the founder of ClearMD LLC ("ClearMD"), an operator of medical clinics that during the COVID-19 pandemic offered testing for the virus. The Indictment charges Rashan with healthcare fraud, wire fraud, making false statements related to healthcare matters, and conspiracy to commit the same. It centrally alleges that, between 2021 and 2023, he caused the submission of millions of dollars of fraudulent claims for reimbursement to healthcare benefits programs and private insurers for services that ClearMD did not provide, and that the scheme caused more than $24 million in losses.

The Government proposes to call, as experts, Amy Turner, a healthcare consultant, and Sheila Chambers, a Medicare and Medicaid fraud investigator. Both propose to testify about the coding of medical services for reimbursement purposes, medical recordkeeping requirements,

---

[1] The Court will resolve in a separate decision the Government's motion to preclude testimony from a defense expert. *See* Dkt. 43.

and ClearMD's coding and recordkeeping practices. Rashan does not dispute Turner and Chambers' qualifications or methodologies. Instead, he moves to exclude discrete opinions they propose to offer, contending that these are irrelevant and/or unduly prejudicial.

For the reasons that follow, the Court denies Rashan's motion to preclude in its entirety.

## I.      Factual Background

### A.      Relevant Charged Conduct

The Indictment, returned June 23, 2025, charges Rashan with conspiracy to commit healthcare and wire fraud, in violation of 18 U.S.C. § 1349; healthcare fraud, in violation of 18 U.S.C. §§ 1347 and 2; wire fraud, in violation of 18 U.S.C. §§ 1343 and 2; and conspiracy to make false statements related to healthcare matters, in violation of 18 U.S.C. § 1035. Dkt. 1 ("Indictment").

As relevant here, it alleges the following.

In or around early 2021, during the COVID-19 pandemic, Rashan opened the first location of ClearMD in Manhattan. *Id.* ¶ 8. Patients who made appointments at ClearMD were promised a COVID-19 diagnostic test, a focused patient exam, and a telehealth visit to discuss their results. *Id.* ¶ 9. In fact, they rarely were seen by a physician or other qualified healthcare professional ("QHP")[2], met only briefly with a medical assistant, and received their test results via email without a follow-up telehealth visit. *Id.* ¶¶ 10–11.

Rashan directed ClearMD to submit claims to Medicare, Medicaid, the Health Resources and Services Administration's Uninsured Program, and private insurance providers (collectively, "payers") that misrepresented ClearMD's services during these patient visits. The Indictment

---

[2] Qualified healthcare professionals include nurse practitioners, certified nurse specialists, physician assistants, and certified nurse mid-wives. Dkt. 42-1 ("Turner Report") at 5. They are distinct from physicians and clinical staff (*i.e.*, medical assistants and registered nurses). *Id.*

alleges four examples of fraudulent billing practices. First, ClearMD submitted thousands of claims that billed for evaluation and management ("E/M") services—*i.e.*, services provided by a physician or other QHP—even though a physician or QHP was rarely, if ever, involved in those visits.[3] *Id.* ¶ 13. Second, ClearMD submitted claims billing for a service rendered on the day after a patient's appointment when, typically that day, the patient merely received an email communicating test results. *Id.* Third, when patients requested a test for COVID-19, ClearMD administered a multiplex test (*i.e.*, a test for COVID-19 plus other pathogens) without the patient's knowledge and then billed insurers for that more expensive test. *Id.* ¶ 14. Fourth, for a single COVID-19 test, ClearMD submitted claims with two to four COVID-19 testing codes. *Id.* ¶ 15.

In or around early 2022, ClearMD began receiving requests from providers for documentation supporting its reimbursement claims. *Id.* ¶ 16. In response, the Indictment alleges, Rashan instructed ClearMD staff to write a software program to generate medical records that supported ClearMD's past billings. *Id.* This software fabricated progress notes and test results for patient visits as far back as a year earlier. *Id.* Although Rashan met with few patients, the software-generated notes typically reflected his electronic signature. *Id.*

### B.    Proposed Testimony of Amy Turner and Sheila Chambers

The Government proposes to call Turner and Chambers to testify as experts regarding medical billing and recordkeeping practices.

The experts' qualifications to so testify are not at issue. Turner is a healthcare and life sciences consultant with experience assisting providers and payers with healthcare billing and

---

[3] As discussed below, one E/M service code does not require involvement of a physician or QHP: code 99211.

coding. Dkt. 42-1 ("Turner Report") at 1. She has been a registered nurse for 37 years and is a certified professional coder. Dkt. 49-1 ("Turner CV") at 1. Chambers is a Medicare and Medicaid fraud investigator for SafeGuard Services LLC, which is contracted by the Centers for Medicare and Medicaid Services ("CMS") to investigate fraud, waste, and abuse. Dkt. 42-2 ("Chambers Report") at 1. She has been a registered nurse for 45 years and is also a certified professional coder. *Id.*; *see also* Dkt. 49-2 ("Chambers CV") at 1.

The two witnesses' proposed testimony significantly overlaps.[4] They propose to testify as to the obligations of healthcare providers in submitting claims to payers for reimbursement; the mechanism for submitting claims; the medical coding system generally; the definitions of certain billing codes; ClearMD's billing practices; the Health Insurance Portability and Accountability Act ("HIPAA") Security Rule; the obligations of healthcare providers to maintain timely medical records; and ClearMD's recordkeeping practices. The Court summarizes the relevant portions of their testimony below.

### 1.     Medical Billing

Healthcare providers are responsible for submitting claims for reimbursement to payers after furnishing a medical procedure or service. Turner Report at 1. Providers submit their claims via the CMS 1500 claim form, which is the standard uniform professional provider healthcare billing form. *Id.* at 2. On that form, providers indicate the medical procedures and services they performed using the Healthcare Common Procedure Coding System ("HCPCS"). *Id.* at 2.

---

[4] Where the experts' proposed testimony is coextensive, the Court cites only Turner's report. The Court cites Chambers' report for statements or opinions not in Turner's report.

HCPCS is divided into two main subsystems: Level I and Level II. Level I provides a system for coding medical procedures and services. Codes in this category are known as Common Procedural Terminology ("CPT") codes. *Id.* at 2. Level II provides a system for identifying products, supplies, and services not included in the CPT codes, such as ambulance services or durable medical equipment. *Id.* at 3.

In addition, there are codes that enable providers to communicate further information to payers about the nature of services rendered. Providers can add a "modifier," which indicates that the performed service or procedure "has been altered by some specific circumstance but not changed in its definition or code." *Id.* For example, a modifier may be used to communicate that only part of a service was performed, or that a service or procedure was performed by more than one physician. *Id.* at 3–4. Providers can also add a place of service code, which identifies where a service or procedure was furnished. *Id.* at 4.

The following codes are relevant to this motion.

      *a.*     *CPT Code 99211*

CPT code 99211 is an E/M code that applies to an "[o]ffice or other outpatient visit for the evaluation and management of an established patient that may not require the presence of a physician or other qualified health care professional." *Id.* at 6. Before the pandemic, this code could be billed only when clinical staff performed services that were "incident to" the services of a physician or QHP for an established patient.[5] *Id.* During the pandemic, CMS stated that code 99211 could also be billed when clinical staff assessed a patient and collected a specimen for COVID-19 diagnostic tests for both new and established patients. *Id.* CMS did not

---

[5] An "established patient" is "one who has received professional services from the physician/qualified healthcare professional of the exact same specialty and subspecialty who belongs to the same group practice within the past three years." Turner Report at 6.

otherwise relax the standard for billing code 99211, which still required that services be "reasonable and necessary for the diagnosis or treatment of an illness" and that the "authorization or order for the ancillary staff's service . . . be indicated in the physician/nonphysician provider's plan of care." *Id.* at 6–7.

Because code 99211 reflects an E/M service, it should only be billed when patient evaluation and management was provided—*e.g.*, when a patient's medical history was reviewed or some decision-making occurred. *Id.* at 7. A telephone call to notify a patient of his or her test results is considered part of the post- or pre-work of an E/M service. *Id.* It is not a separately billable service. *Id.*

Relevant here, Turner proposes to testify:

> I am aware of no authority that would support billing code 99211 for simple delivery of test results (including if that delivery of test results was by phone or email). Accordingly, it would be improper for a provider to bill 99211 in such circumstances. Relatedly, I am aware of no authority to support a QHP billing two E/M services on the same day for a single patient visit.

*Id.*

### b.     *Modifier 95*

Modifier 95 represents synchronous telemedicine services rendered via a real-time interactive audio and visual telecommunications system, widely known as "telehealth." Chambers Report at 7. During the pandemic, modifier 95 was applied to E/M services provided via telehealth. Turner Report at 7. Because the Medicare program does not cover services furnished outside the United States, both the patient and provider must have been in the United States in order for the provider to seek reimbursement for telehealth services. *Id.* This rule remained in effect during the pandemic and was "not affected by telehealth flexibilities put in place" during that time. *Id.*

Relevant here, Turner proposes to testify:

> I am aware of no authority to support that a QHP could bill for services provided while the rendering provider for the services was located overseas at the time the services were rendered.

*Id.* at 8.

c.   *CPT Code 87635 & HCPCS Codes U0004, U005, 0240U, and 0241U*

Several codes were introduced during the pandemic to describe COVID-19 tests.

CPT code 87635 and HCPCS code U0004 apply to polymerase chain reaction ("PCR") tests that identify a single pathogen. *Id.* Code 87635 describes a PCR test using an amplified probe technique. *Id.* Code U0004 describes a PCR test using high throughput technology, which is more sophisticated equipment that requires intensive technician training.[6] *Id.* In general, reimbursement for code U0004 is higher than reimbursement for code 87635. *Id.*

HCPCS codes 0240U and 0241U apply to PCR tests that identify multiple respiratory pathogens. *Id.* at 9. The former describes a test for influenza A and B and COVID-19, while the latter describes a test for influenza A and B, respiratory syncytial virus, and COVID-19. *Id.* In general, reimbursement for multiple pathogen tests is higher than for single pathogen tests. *Id.*

CMS instructed that, for a single PCR test, no more than one of these codes should be billed. *Id.* Accordingly, when a HCPCS/CPT code describing a panel is reported, codes identifying the individual tests included in the panel should not be reported separately. *Id.* A provider reporting a panel test for COVID-19 and influenza thus may not also report codes for single-pathogen PCR tests. *Id.* at 9–10.

---

[6] Code U0005 is available for use in combination with U0004 where a PCR test is completed within two calendar days from specimen collection. Chambers Report at 8.

7

Relevant here, Turner proposes to testify:

> I . . . understand that at least in some instances ClearMD billed a combination of CPT codes including 87635, U0004, U0005, and 0241U when a patient presented for a PCR test for COVID-19.  In particular, I understand that at least in some instances ClearMD billed 87635, U0004, and 0241U in combination for such a test.  I am aware of no authority supporting such billing.

*Id.* at 9.

### d.    HCPCS Code G2023

HCPCS Code G2023 represents specimen collection for COVID-19.  Chambers Report at 9.  CMS instructed that when specimen collection is performed as part of another service or procedure, such as a higher-level visit furnished by a QHP, the higher-level code should be billed and specimen collection is not separately payable.  Turner Report at 10.  New York guidance similarly stated that Medicaid reimbursement is available for specimen collection when that is the only service performed.  Chambers Report at 11.  Accordingly, code G2023 would not be reportable or reimbursable when a provider reported an E/M service with CPT codes 99203, 99213, and/or 99211, or when a provider reported a testing service with CPT/HCPCS codes 87635, U0004, U0005, 0240U, and/or 0241U.  Turner Report at 10.

Relevant here, Chambers proposes to testify: "I am aware of no authority endorsing billing both a testing code (*e.g.*, 87635, U0004, 0241U) and specimen collection code G2023." Chambers Report at 9.

### e.    Place of Service Codes 11 and 81

Place of service code 11 indicates a service or treatment rendered at an office (defined as a location other than a hospital, skilled nursing facility, military treatment center, *etc.*).  Turner Report at 4.  Place of service code 81 indicates a service or treatment rendered at an independent laboratory (defined as a laboratory certified to perform diagnostic and/or clinical tests independent of an institution or physician's office).  *Id.*

8

Relevant here, Turner proposes to testify:

> I understand that during certain periods, ClearMD reported place of service code 81 in connection with code G2023 while reporting place of service code 11 in connection with other services on the same claim. I am aware of no authority to support reporting multiple place of service codes on the same claim, including when specimen collection occurred at the same location as the other services billed.

*Id.* at 10.

### 2.    Medical Recordkeeping

Healthcare providers are responsible for maintaining patients' medical records. *Id.* at 13.

Turner and Chambers propose to testify to the following related to medical recordkeeping.

#### a.    *HIPAA Security Rule*

The HIPAA Security Rule governs the maintenance of medical records. *Id.* It

established national standards to protect individual personal health information ("PHI"). *Id.* The

Security Rule requires providers to "maintain reasonable and appropriate administrative,

technical, and physical safeguards" for protecting electronic PHI. Chambers Report at 11.

Providers must "ensure the confidentiality, integrity, and availability" of the electronic PHI that

they create, receive, and transmit. *Id.* Records of patient visits should be completed "at the close

of the patient encounter in real time" to prevent tampering, disclosure, or revision. *Id.* at 11–12.

#### b.    *Timely Recordkeeping Requirements*

Services should be documented "during, or as soon as practicable after" they are provided

"in order to maintain an accurate medical record." Turner Report at 13. Although Medicare

does not define the time period that is "practicable," a "reasonable expectation would be no more

than a couple of days away from the service itself." *Id.* Such timely recordkeeping prevents the

provider from forgetting details of the services rendered. *Id.*

Relevant here, Turner proposes to testify:

> It would be improper for a provider to document a service many months after that service was rendered.

*Id.* Chambers would testify likewise, and add that this remained true "[t]hroughout the period of the COVID-1[9] pandemic." Chambers Report at 12.

As to supplementing existing medical records, Turner proposes to testify:

> It would . . . be improper to supplement a record created at or near the time that a service was rendered with information that either was not collected at or near the time of the service or was not collected at all.

Turner Report at 13. Chambers proposes to testify:

> Where original documentation was later amended, corrected, or supplemented, such an amendment, correction, or addendum must have: [c]learly and permanently identified any amendment, correction or delayed entry as such; [c]learly indicated the date and author of any amendment, correction or delayed entry; and [c]learly identified all original content, without deletion.

Chambers Report at 12.

## C.    Relevant Procedural History

On January 23, 2026, the Court set a schedule for briefing related to expert testimony. Dkt. 37. On March 2, 2026, Rashan moved to preclude portions of the expert testimony of Turner and Chambers. Dkt. 42 ("Mot."). On March 11, 2026, the Government opposed. Dkt. 44 ("Opp'n"). On March 16, 2026, Rashan replied. Dkt. 47 ("Reply").

On April 2, 2026, in response to an Order from the Court stating that it had not received the *curricula vitae* ("CVs") of Turner or Chambers, the Government filed their CVs on the docket. Dkt. 49.

## II.    Governing Legal Standard

Motions to preclude expert testimony commonly are based on Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), insofar

as they challenge the expert's qualifications and/or the reliability of her conclusions.  Rashan's

motion, however, does not implicate those issues.  Instead, he seeks to exclude discrete

propositions to which Turner and Chambers would testify, based on Federal Rules of

Evidence 401 and 403.  Rule 401 states that "[e]vidence is relevant when 'it has any tendency to

make a [material] fact more or less probable than it would be without the evidence.'"  *United*

*States v. White*, 692 F.3d 235, 246 (2d Cir. 2012) (quoting Fed. R. Evid. 401). "A material fact is

one that would 'affect the outcome of the suit under the governing law.'"  *Beth Israel Med.*

*Ctr. v. Horizon Blue Cross & Blue Shield of N.J., Inc.*, 448 F.3d 573, 579 (2d Cir. 2006)

(quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  Rule 403 authorizes a

court to exclude relevant evidence where its probative value is substantially outweighed by the

risk of "unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or

needlessly presenting cumulative evidence."  *United States v. Gupta*, 747 F.3d 111, 131 (2d

Cir. 2014) (quoting Fed. R. Evid. 403).  Those rules equally apply to expert testimony.  *See*

*Davis v. Carroll*, 937 F. Supp. 2d 390, 412 (S.D.N.Y. 2013) ("Expert testimony must . . . be

relevant under Rule 401 and must not be unfairly prejudicial under Rule 403.").

## III.    Discussion

Rashan moves to preclude portions of Turner and Chambers' testimony related to

medical billing and medical recordkeeping.  The Court considers each in turn.

### A.    Testimony About the Absence of Support for ClearMD's Alleged Billing Practices

Rashan first seeks to preclude testimony to the effect that there is an absence of authority

supporting ClearMD's alleged billing practices.  Mot. at 2–4; *see, e.g.*, Turner Report at 7–10 ("I

am aware of no authority that would support" billing code 99211 for test result delivery, billing

two E/M services for single patient visit, billing for telehealth services rendered while provider

11

overseas, billing combination of COVID-19 testing codes, or reporting multiple place of service codes on same claim); Chambers Report at 9 ("I am aware of no authority endorsing billing both a testing code . . . and specimen collection code G2023"). For two principal reasons, he argues, such testimony is improper.

First, Rashan argues that the challenged testimony is prejudicial because it could mislead the jury to think that, where there is no clear authority as to a billing practice, that practice is improper. Mot. at 4. Such, he argues, would effectively but wrongly shift the burden to Rashan to justify his billing practices, whereas the burden is on the Government to establish that Rashan's claims for reimbursement were false and fraudulent. *Id.* Rashan's premise is wrong. Neither expert proposes to testify that Rashan's alleged billing practices were improper because they were not expressly authorized. On the contrary, each of the expert's challenged statements—to the effect that the practices at issue lacked supportive authority—appears in the context of a detailed review of the relevant billing code's definition and guidance. Each expert opines that those definitions and guidance affirmatively prohibited the billing practices which Rashan is alleged to have used.

For example:

- Turner states that she is "aware of no authority that would support billing code 99211 for simple delivery of test results" after summarizing guidance stating that, in order to bill that code, some evaluation and management must have been provided; that a telephone call relaying test results is part of the pre- or post-work of an E/M service and thus not separately billable; that the pandemic did not relax these requirements; and that it therefore would be improper to separately bill for notifying a patient of test results by telephone or email. Turner Report at 6–7.

- Turner states that she is "aware of no authority" to support billing for a telehealth service rendered while the provider "was located overseas at the time the services were rendered" after reviewing guidance stating that Medicare does not apply to services furnished outside the United States; that telehealth services are considered furnished in the places where the provider and patient are

located; and that it therefore would be improper for a provider to bill for a service provided while overseas. *Id.* at 7–8.

- Chambers states that she is "aware of no authority endorsing billing both a testing code (e.g., 87635, U0004, 0241U) and specimen collection code G2023" before summarizing guidance stating that Medicaid reimbursement is available for specimen collection "when this is the only service being performed" and that providers "should not bill separately for specimen collection" when also billing for a different COVID-19 test. Chambers Report at 9, 11.

Read in context, Turner and Chambers' testimony that ClearMD's alleged billing practices are improper is not, as Rashan depicts it, "premised on their lack of awareness of authority affirmatively authorizing particular billing practices." Mot. at 3. Instead, the two experts base their opinions on specific prescriptive and/or proscriptive definitions in the codes and related guidance. Far from threatening to mislead or confuse the jury, the testimony at issue thus provides a fulsome account of the regulatory landscape in which ClearMD operated. The experts, in effect, attest both to the clear ground rules set by the codes and guidance *and* to the absence of contrary authority. *See, e.g., Sec. & Exch. Comm'n v. Ripple Labs, Inc.*, No. 20 Civ. 10832, 2023 WL 5670711, at *6 (S.D.N.Y. Mar. 6, 2023) (admitting expert testimony where, "[f]ar from confusing the jury, [expert's] opinions would assist the jury in understanding a technical and specialized industry").

Second, Rashan argues that the challenged testimony is impermissible under *Siddiqi v. United States*, 98 F.3d 1427, 1439 (2d Cir. 1996). In *Siddiqi*, an oncologist was convicted at trial of defrauding the Medicare program by submitting false reimbursement claims for chemotherapy treatments. *Id.* at 1428. He was alleged to have used code 96500—which covered chemotherapy "administered by qualified assistant under supervision of physician or by physician"—to bill for treatments that occurred when he was out of the country. *Id.* at 1429. The prosecution's case turned on whether Siddiqi, by arranging for another physician to cover for him while he was

13

traveling, had provided "supervision" for the treatments for which he billed. *Id.* at 1439. At trial, the testimony of both parties' witnesses supported that the definition of "supervision" was ambiguous—there was no controlling authority. *Id.* On appeal, the Circuit considered whether there was sufficient evidence to support the Government's theory of guilt—that Siddiqi committed fraud when he arranged for a covering physician and then billed 96500 for treatments that occurred while he was out of the country. *Id.* The Circuit found the Government's evidence "inadequate as a matter of law." *Id.* Because the definition of supervision was "unclear" and Saddiqi's billing was "arguably appropriate," the Circuit held, the record could not support that Siddiqi billed code 96500 "with a dishonest intent." *Id.* The Circuit noted that the Government had failed to identify "any authority whatsoever that would have alerted someone in Siddiqi's position" that code 96500 could not be billed under those circumstances. *Id.* Accordingly, "[a]bsent some affirmative reason to believe that use of code 96500" was inapplicable, the Circuit stated, "billing under that code is at worst an attempt to bill at the outer limits permitted, not fraud." *Id.*

*Siddiqi* does not avail Rashan here. That is because the jury in Rashan's case will receive affirmative evidence supporting the inapplicability of the codes to the services for which ClearMD sought reimbursement. That evidence, as reviewed above, will centrally include the text and definitions of, and/or guidance associated with, the codes at issue. The Government has thus identified authority that "would have alerted" Rashan that the challenged billing practices were impermissible. *Id.* And, unlike in *Siddiqi*, Rashan's motion does not point to any ambiguity in the billing codes that would have made those practices "arguably appropriate." *id.*; *see United States v. Singh*, 390 F.3d 168, 188–89 (upholding healthcare fraud conviction, and distinguishing *Siddiqi*; whereas the code at issue in *Siddiqi* was "susceptible of varying

interpretations," the billing code at issue had "no ambiguities" and made it "plain enough" that services for which defendant billed were not covered).[7]

Rashan is wrong, Mot. at 3, to read *Siddiqi* to categorically preclude testimony about the absence of guidance supporting a defendant's challenged billing practices.[8] Under *Siddiqi*, the Government may not rely on such evidence to salvage a claim of fraud where it is ambiguous whether the code barred the billing practice. But where there is an "affirmative reason to believe" the code did not cover a service, *Siddiqi* does not bar the Government from eliciting from an expert the absence of contrary guidance. Such is the case here.

Accordingly, Turner and Chambers' testimony to the effect that there is no affirmative support for ClearMD's challenged billing practices is proper. The Court thus denies Rashan's motion to preclude such testimony. *See, e.g., United States v. Perryman*, 2025 WL 2383608, at *3 (2d Cir. Aug. 18, 2025) (summary order) (district court erred in excluding CPT coding expert testimony, which was "relevant to [defendant's] intent, as it pertained to any ambiguity inherent in the relevant CPT codes, the responsibility of doctors for medical billing, and the appropriate coding").

### B.    Testimony That ClearMD's Alleged Recordkeeping Practices Were Improper

The experts' proposed testimony related to medical recordkeeping has two components. First, they propose to testify about the rules governing the timing of providers' completion of

---

[7] Rashan seeks to distinguish *Singh* on the ground that the evidence at issue there concerned "what was required and prohibited in terms of billing," and that the Government was not asking the jury to infer fraudulent intent in the absence of explicit prohibition. Reply at 3. But on the proffer of the Government's expert testimony in this case, the same is so here.

[8] Indeed, *Siddiqi* did not concern the admissibility of expert testimony.

medical records. Second, they propose to testify about one of those rules in particular: the HIPAA Security Rule. Rashan challenges both areas of testimony.

### 1. Timely Recordkeeping Requirements

Rashan seeks to preclude testimony that it was improper to document a service many months after it was rendered. Mot. at 4; *see, e.g.*, Turner Report at 13 ("It would be improper for a provider to document a service many months after that service was rendered."); Chambers Report at 12 (similar).

Rashan first argues that such testimony is irrelevant because the charged offense does not require proving, as an element, that ClearMD failed to maintain contemporaneous records or deviated from best practices for documenting care. Mot. at 5. But that does not make such evidence irrelevant. To establish Rashan's guilt, the Government, at trial, will be required to prove that he (1) acted with fraudulent intent and (2) participated in a scheme to defraud healthcare benefit programs. *See* 18 U.S.C. § 1347. The Government may fairly argue that Rashan's alleged failure to timely create and maintain records of patient visits—in contravention of rules governing maintenance of medical records—is circumstantial evidence of his intent to defraud and his participation in the charged scheme.

As to fraudulent intent, the Government of course may prove such through circumstantial evidence. *See United States v. Autuori*, 212 F.3d 105, 116 (2d Cir. 2000); *Singh*, 390 F.3d at 188 (fraudulent intent is "often established by circumstantial evidence, being rarely susceptible of direct proof" (citation omitted)). Here, the Government may fairly argue that the fact that Rashan allegedly recorded notes on patient visits months—and sometimes a year—after they occurred makes it less likely that he believed in "the truth of the representations" they contained. *See Kalani v. United States*, No. 2 Civ. 8663, 2002 WL 31453094, at *6 (S.D.N.Y. Oct. 31,

16

2002) ("If in good faith the defendant in question believed that his or her statements or representations were not false or fraudulent, then he or she cannot be guilty of [healthcare fraud]."). A jury may find it more likely that the information that was added long after the fact was fabricated given the context of the pandemic. Because ClearMD saw thousands of patients for the same purpose—COVID-19 testing—the Government can fairly argue that it would have been challenging, if not impossible, for Rashan and his staff to recall an individual patient's conditions, and the services provided to her, during a visit many months earlier. To the extent that Rashan's patient data entry and documentation practices contravened norms or guidance, that too can fairly be argued to support an inference of fraudulent intent. *See United States v. Cristobal*, 2024 WL 1506750, at *3 (2d Cir. Apr. 8, 2024) ("[W]e have allowed experts to testify on relevant regulations and industry standards as a basis to evaluate a defendant's conduct and intent."). A jury that credited that Rashan deviated from governing standards could find such to make it more likely that he acted deliberately, rather than inadvertently, in making factually false representations about patient care when seeking reimbursement.

For much the same reasons, a jury could find Rashan's alleged recordkeeping practices to support that the charged scheme to defraud existed. The Indictment alleges that the scheme included generating false medical records to support ClearMD's fraudulent billings. Indictment ¶ 16. It alleges that ClearMD, at Rashan's direction, submitted fabricated progress notes and test results to payers. *Id.* ¶¶ 16–18. A jury could reasonably infer that records completed months after patient visits occurred were inherently more likely to be false—and appreciated as such by ClearMD personnel who created them—than records completed contemporaneously. *Cf. United States v. Gonzalez*, 764 F.3d 159, 169 (2d Cir. 2014) (noting, in explaining hearsay exception,

17

that contemporaneous statements about observed events "leave less time to forget or fabricate and, therefore, tend to be reliable").

Rashan counters by noting, correctly, that failure to comply with recordkeeping rules does not itself constitute fraud. Mot. at 5. But a practice can be relevant to the existence of fraud, or fraudulent intent, without itself being unlawful. *See, e.g.*, *United States v. Litvak*, 808 F.3d 160, 179–80 (2d Cir. 2015) ("To be relevant, evidence need not be sufficient by itself to prove a fact in issue, much less to prove it beyond a reasonable doubt." (citation omitted)); *United States v. Certified Env't Servs., Inc.*, 753 F.3d 72, 90 (2d Cir. 2014) ("[T]he definition of relevance under Fed. R. Evid. 401 is very broad."). Here, a jury could find Rashan's delinquent recordkeeping was consistent with—and makes it more likely that—he knowingly participated in the charged fraud scheme.

Rashan also argues that the probative value of tardy recordkeeping is reduced in the context of the pandemic, because certain recordkeeping requirements were relaxed to enable medical professionals to focus on treatment. Mot. at 5. Rashan will be at liberty to elicit that fact, including through cross-examination of Turner and Chambers, and to argue that, in light of that context, a jury should not infer fraudulent intent. *See, e.g.*, *Thomas v. YRC Inc.*, No. 16 Civ. 6105, 2018 WL 919998, at *7 (S.D.N.Y. Feb. 14, 2018) ("To the extent plaintiff believes [expert] has failed to consider alternative scenarios or additional facts, his remedy is the introduction of additional evidence and cross-examination."). But whether such an inference is supported is ultimately a question for the jury. Given the extent of the record-keeping irregularities alleged at ClearMD, a jury could rationally draw the inference urged by the Government.

Rashan separately argues that a jury might equate recordkeeping deficiencies with criminal fraud, prejudicing him. Mot. at 6. That risk is readily addressed by an instruction to the jury clarifying the point and explaining the limited purpose(s) for which these deficiencies may be considered. *See United States v. Abu-Jihaad*, 630 F.3d 102, 133 (2d Cir. 2010) ("the district court properly minimized the risk of unfair prejudice through limiting instructions"). It is not a basis for preclusion. *See, e.g., United States v. Abdullah*, No. 20 Cr. 677, 2024 WL 4519860, at *4 (S.D.N.Y. Oct. 16, 2024) (admitting evidence where court can "issue an appropriate limiting instruction to the jury" if risk of unfair prejudice arises); *United States v. Patel*, No. 21 Cr. 220, 2023 WL 2643815, at *9 (D. Conn. Mar. 27, 2023) (similar).

Accordingly, the Court denies Rashan's motion to preclude Turner and Chambers from testifying about rules governing medical recordkeeping and whether ClearMD's alleged practices were compliant.

### 2.    The HIPAA Security Rule

Rashan also moves to preclude the experts' anticipated testimony about the HIPAA Security Rule. Mot. at 6. That testimony would be to the effect that "[m]edical records should be maintained by providers in accord with the requirements of the [HIPAA] Security Rule," which "protect[s] individual personal health information." Turner Report at 13; *see also* Chambers Report at 11 (same). Rashan argues that such testimony is irrelevant and unfairly prejudicial. Mot. at 6; Reply at 5. The Government responds that the Security Rule is relevant because it establishes that the handling of patient data "is subject to various rules and standards," helps explain the requirement of real-time recordkeeping, and permits the fair argument that Rashan's breach of these was circumstantial evidence of his fraudulent intent. Opp'n at 4–5.

19

The Government is correct. The Security Rule requires providers to maintain medical records "in real time" to protect patient data from "tampering, disclosure, or revision." *See* Chambers Report at 11–12; Turner Report at 13 (similar). Testimony about that Rule will help the jury understand the important reasons for requiring timely recordkeeping and assess whether Rashan's alleged breach of these requirements is suggestive of nefarious intent. To the extent that the experts refer to HIPAA as context, the Court expects such references to be finite. *See* Opp'n at 5 (anticipating "any such testimony, if elicited at all, would be extremely limited in nature"). The Court can further mitigate any prejudice by an instruction explaining the limited purposes for which the jury can consider that testimony, and emphasizing that Rashan is not charged with violating HIPAA. The Court accordingly denies Rashan's motion to preclude expert testimony about the Security Rule. *Cf. In re Mirena IUD Prods. Liab. Litig.*, 169 F. Supp. 3d 396, 467 (S.D.N.Y. 2016) (permitting expert testimony regarding "compliance with [Food and Drug Administration ("FDA")] regulatory standards" where complaint alleged violations of state law, not regulations).

<h3 style="text-align:center">CONCLUSION</h3>

For the foregoing reasons, the Court denies Rashan's motion to preclude aspects of the testimony of Turner and Chambers. The Clerk of Court is respectfully directed to terminate the motion pending at docket 42.

SO ORDERED.

*Paul A. Engelmayer*
_____
PAUL A. ENGELMAYER
United States District Judge

Dated: April 9, 2026
      New York, New York

20